## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

United States of America,

Crim. No. 19-340 (MJD/BRT)

               Plaintiff,

v.

Dawn Marie Marcks (1), and Stephany
Marie Wilde (2),

**REPORT AND
RECOMMENDATION**

               Defendants.

---

Nathan Hoye Nelson, Esq., Assistant United States Attorney, counsel for Plaintiff.

Aaron J. Morrison, Esq., Wold Morrison Law, counsel for Defendant Dawn Marie
Marcks.

Lisa M. Lopez, Esq., Office of the Federal Defender, counsel for Defendant Stephany
Marie Wilde.

---

BECKY R. THORSON, United States Magistrate Judge.

       This matter is before the Court on Defendant Dawn Marie Marcks's Motion to

Suppress Search and Seizure (Doc. No. 26), and Defendant Stephany Marie Wilde's

Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 38).

A hearing was held on August 27, 2020, and the parties submitted supplemental briefing

to the Court. (Doc. Nos. 57, 63, 65, 66.) For the reasons set forth below, this Court

recommends that Defendant Marcks's motion be granted in part and denied in part, and

Defendant Wilde's motion be denied.

## I.    Background

### A.    The Search of Defendant Marcks's Bag

On June 21, 2019, Austin Police Department Detective Patrick Retterath was driving to Austin, Minnesota after going home for his lunch break. (Doc. No. 61, Tr. 16.) Detective Retterath was headed east on County Road 16, about a quarter mile west of the intersection with County Road 61, when he saw a person on a motorcycle driving north on County Road 61, away from Austin. (*Id.* at 17–18.) Upon reaching the intersection, Detective Retterath observed a black bag lying in the road. (*Id.* at 19.) Because the bag was obstructing traffic, Detective Retterath stopped his vehicle and retrieved the bag. (Tr. 19–20.) Detective Retterath noted that it was a Harley Davidson brand bag, found a red bungee cord nearby, and therefore assumed the bag had fallen off the motorcycle that he saw as he approached the intersection. (*Id.*)

After retrieving the bag, Detective Retterath waited approximately five minutes, thinking that the owner might return for it. (*Id.* at 21.) When the owner did not return, Detective Retterath decided to search the bag for items that might allow him to identify its owner, such as a wallet or ID. (*Id.*) Detective Retterath testified that prior to searching the bag, he had no reason to suspect that it contained contraband. (*Id.* at 22.) Detective Retterath began his search with the front pockets. (*Id.*) There, he found two cell phones, one locked and the other unlocked. (*Id.*) Detective Retterath accessed the call logs on the unlocked phone and tried to call one or two of the most recent numbers but could not do so due to lack of service. (*Id.*) Detective Retterath recognized one name listed in the phone's contacts, "Jake Wilde," as "a common name in law enforcement" and as

2

someone who "had a lot of dealing with the deputies." (*Id.* at 23.) Detective Retterath then looked at photographs on the phone for about 10–15 seconds to see if he could determine what the owner looked like. (*Id.* at 38, 45.) Detective Retterath noted that an individual appeared in a number of the pictures, but he did not recognize her. (*Id.* at 45.)

Detective Retterath next unzipped the bag to continue his search for identifying information. (*Id.* at 23.) As he searched, Detective Retterath began to make an inventory of the items he found. (*Id.*) He testified that he did so because the bag was now his responsibility, and that department policy required that he keep an inventory to ensure documentation of valuables and to uncover any materials that might pose a danger to him. (*Id.* at 23–24.)

The first item Detective Retterath found inside the bag was a motorcycle helmet. (*Id.* at 24.) He also found some bandanas, a pink wallet, and a coin purse. (*Id.*) Detective Retterath then opened the wallet to see if there was identification inside. (*Id.*) He found a Minnesota driver's license for Dawn Marcks, indicating that she resided on 6th Avenue Southeast in Austin, Minnesota, approximately four miles from where Detective Retterath found the bag. (*Id.* at 24–25.) The wallet also contained other items bearing the name "Dawn Marcks" as well. (*Id.* at 25.) Detective Retterath testified that he had never encountered a person by that name before.

Detective Retterath next searched the coin purse. (*Id.*) It was operated by squeezing the sides, which opened the top. (*Id.*) Upon picking it up, Detective Retterath thought it felt "kind of hard," but testified that he had no reason to think it contained drugs at that point. (*Id.* at 26.) When he opened the coin purse, Detective Retterath

observed "the closed top of a plastic Ziploc baggie," and upon partially pulling it up, he

saw "a white crystallized substance in [it] that [he] assumed to be methamphetamine."

(*Id.*) Approximately twenty minutes had elapsed between the time Detective Retterath

stopped at the scene, and his search of the coin purse. (*Id.* at 27.)

Detective Retterath next radioed to have a Mower County Sheriff's deputy

dispatched to his location because the bag was within the county's jurisdiction, and not

the City of Austin. (*Id.* at 27–28.) Deputy Jason Bresser arrived some time thereafter, and

Detective Retterath "gave him [his] statement of what [he] had found and what had

happened." (*Id.* at 28.) Deputy Bresser recorded that statement. (*Id.*) Detective Retterath

estimates that he was at the scene for an additional twenty to twenty-five minutes and

stated that no one arrived to claim the bag during that time. (*Id.* at 28–29.) The bag was

subsequently logged into evidence by the Mower County Sheriff's Department. (*Id.* at

52.)

**B.    The Search Warrant for Defendant Marcks's Phones**

Because methamphetamine was found in the bag, the case was assigned to Mower

County Detective Bruce Hemann, who is assigned to Mower County's Narcotics Task

Force. (Tr. 51–53.) Detective Hemann was on vacation on June 21, 2019, when the bag

was found, but he was told about the bag when he returned to work on June 25, 2019. (*Id.*

at 52.) Because he did not believe he had adequate evidence to prove a possession case at

that time, Detective Hemann sought and obtained a warrant to search the two cell phones

found in the bag. (*Id.* at 53; Gov't Ex. 2.) Because one of the phones was locked, it was

sent to a technician for forensic analysis. (Tr. 55.) Upon obtaining the search warrant,

4

however, Detective Hemann was able to immediately conduct an examination of the unlocked phone. (*Id.* at 54.) Detective Hemann found communications in the unlocked phone indicating the sale of drugs, including a text message exchange with "Stephany" about "wanting the QP" back. (*Id.*) Detective Hemann testified that "QP" means "quarter pound" in relation to drugs. (*Id.* at 54–55.) The party named "Stephany" replied that she did not have the "QP" anymore, and that a person referred to as "State Farm" really liked it. (*Id.*) The phone contained several additional contacts "that were asking for drugs" as well. (*Id.* at 55.)

### C.    Subsequent Investigation

On July 2, 2019, Detective Hemann received an unsolicited phone call from John Mulnix, an Iowa Division of Narcotics Enforcement ("DNE") agent. (Tr. 55, 57.) The DNE agent informed Detective Hemann that DNE was executing a search warrant in Iowa, and the target of that investigation was a person nicknamed "State Farm." (*Id.* at 56–57.) According to the DNE agent, "State Farm" said that his source of supply for drugs was Stephany Wilde from Austin, Minnesota, and that her source was someone named "Diane" or "Diana." (*Id.* at 56–57.) Detective Hemann then sent pictures of both Defendant Wilde and Defendant Marcks to the DNE, and "State Farm" was able to positively identify them as Stephany Wilde and the person who he called "Diana." (*Id.* at 57.)

Sometime after that, the DNE agent used an informant to make a controlled purchase of approximately one ounce of methamphetamine from Defendant Wilde in Iowa. (*Id.* at 58.) The DNE agent wanted to perform a second controlled buy of drugs

from Defendant Wilde, and therefore requested that Detective Hemann not "initiate anything too involved" on the Minnesota side of the investigation. (*Id.*) Detective Hemann complied with that request, limiting his investigation to surveillance of Defendant Marcks's residence and two "garbage rips." (*Id.*) A garbage rip, also called a trash pull, involves obtaining and examining the contents of a target's garbage that has been abandoned curbside. (*Id.* at 58–59.) In the first trash pull, Detective Hemann found packaging for two cartridges of THC—the active ingredient in marijuana—for use in a vape-pen. (*Id.* at 59, 71–72; Gov't Ex. 3.) Nothing of evidentiary value was found in the second trash pull. (*Id.* at 72.)

On August 14, 2019, Detective Hemann received a phone call from a probation officer who said that he had a probationer who wished to provide information concerning drug dealing. (*Id.* at 60–61.) This call was unsolicited. (*Id.* at 61.) Detective Hemann met the probationer later that day and signed him up as a confidential informant ("CI"). (*Id.*) The CI told Detective Hemann that Defendant Marcks had traveled to California and returned with a large quantity—thirty to forty pounds—of methamphetamine. (*Id.* at 62.) The CI further represented that he knew this firsthand, had seen the drugs at Defendant Marcks's residence, and provided Detective Hemann correct information regarding Defendant Marcks's address, and knew that she drove a white Chrysler. (*Id.* at 62–63.) The CI also stated that Defendant Marcks was having Defendant Wilde traffic the drugs to a person in Iowa who went by "State Farm." (*Id.* at 62.) Finally, the CI told Detective Hemann that Defendant Marcks had again left the state and that the CI believed that she was traveling to California to obtain more drugs. (*Id.* at 63.)

6

Investigators continued their surveillance at Defendant Marcks's residence and confirmed that the white Chrysler was not present there. (*Id.* at 64.) But two days later, on August 16, 2019, the white Chrysler was again seen parked at Defendant Marcks's residence. (*Id.*) Believing that Defendant Marcks had returned from California with drugs and concerned that the drugs would be moved away from the residence, Detective Hemann applied for a search warrant to search Defendant Marcks's residence. (*Id.* at 64–65.)

On August 16, 2019, officers executed the search warrant at Defendant Marcks's residence, finding a large amount of methamphetamine, handguns, long guns, a large amount of cash, and other evidence. (*Id.* at 66; *see* Gov't Ex. 4 at 9–10.) During execution of the search warrant, Defendant Marcks gave a recorded Mirandized statement to Detective Hemann. (*Id.* at 66–67; Gov't Ex. 5.) Defendant Marcks was arrested, and later that day gave a second recorded Mirandized statement to Detective Hemann and an Austin police investigator named Mark Walski. (*Id.* at 67–68; Gov't Ex. 6.)

### D.    The Search Warrant for the Phone Number Ending in 5139

On September 3, 2019, Detective Hemann applied for a search warrant for records, including location information, for the phone number ending in 5139, believed to have been used by Defendant Wilde. (*See* Gov't Ex. 7.) In the search warrant affidavit, Detective Hemann relayed Detective Retterath's discovery of Defendant Marcks's bag and the methamphetamine therein, as well as Detective Hemann's search of the two cell phones found in the bag. (*Id.* at 2.) Detective Hemann states that the results of the forensic examination of those phones (he received the forensic reports on August 24,

2019) included "extensive conversations about drugs sales and the transportation of drugs" along with two pictures of large bags that Detective Hemann believed were full of methamphetamine. (*Id.*) In addition, the communications on the two phones included text messages between Defendant Marcks and a phone number from Mexico listed under the name "Jose1." (*Id.*) These messages detailed the transportation of thirty pounds of methamphetamine from California to Austin, Minnesota, and included statements related to how the drugs were packaged. (*Id.* ("I had the guys put them in bags they are 2 pounds in a bag and 6 of them are 1 pound per bag.").)

The affidavit also states that Defendant Marcks recruited two friends—Defendant Wilde and D.T.—"to fly to California and drive a vehicle back that ha[d] methamphetamine hidden inside it." (*Id.*) The affidavit states that Defendant Marcks bought airline tickets through Spirit Airlines for Defendant Wilde and D.T. to travel to California on June 6, 2019, and gave them a phone number to call or text upon arrival. (*Id.*) The messages on Defendant Marcks's phone indicated that Defendant Wilde and D.T. were to meet up with Jose1's daughter, "Ashley." (*Id.*) Based on the messages on the phone, it appears that Defendant Wilde and D.T. had trouble contacting Ashley, leading Defendant Marcks to text Jose1 "have her call my girl. [XXXXXX]-5139 stephany." (*Id.* at 3.) This text message gave Detective Hemann reason to believe that the warrant's target phone number, ending in 5139, was in Defendant Wilde's possession during the California trip. (*Id.*)

The text messages also detail Defendant Wilde and D.T.'s return trip after their meeting with Ashley and obtaining the vehicle. They state that they are going to go to

Las Vegas and stay there for the night. (*Id.* at 2.) They then relay that they are in Utah on June 7, Nebraska on June 8, and Austin, Minnesota on June 9. (*Id.*) A text message from June 9, 2019, at 9:01 a.m. states, "they made it. Gonna start tearing it apart." (*Id.*) Google data from Defendant Marcks's phone revealed internet searches beginning at 9:41 a.m. for "how to take out whole center console on vw jetta." (*Id.*) At 11:49 a.m., Defendant Marcks texted Jose1 with a picture of two baggies that appear to contain meth. (*Id.*)

Based on this information, Detective Hemann stated probable cause existed to believe that records for the phone number ending in 5139 would contain evidence of a crime. (*Id.* at 1.) Detective Hemann stated that this "data may consist of information such as, but not limited to, GPS coordinates and tower locations to determine trips to California or other states over the last year," and "may contain detailed information such as, but not limited to, photographs or other historical messages that occurred." (*Id.* at 3.) The state court judge issued the requested search warrant.

## II.    Analysis

Defendant Marcks filed a Motion to Suppress Search and Seizure on January 28, 2020. (Doc. No. 26.) Defendant Wilde filed a Motion to Suppress Evidence Obtained as a Result of Search and Seizure on February 28, 2020. (Doc. No. 38.) The Government opposed the motions. (Doc. No. 40.) On August 27, 2020, this Court held a hearing on the motions at which testimony was heard from Detectives Retterath and Hemann and exhibits were received into evidence. (Doc. Nos. 57, 58.) This Court requested post-hearing briefing from the parties. (Doc. No. 60.) Defendants each filed a Memorandum in Support on September 24, 2020 (Doc. Nos. 63, 65), and the Government filed a

9

Memorandum in Opposition on October 8, 2020. (Doc. No. 66.) For the reasons that follow, this Court recommends that Defendant Marck's motion be granted in part and denied in part, and Defendant Wilde's motion be denied.

### A.    Defendant Marcks's Motion to Suppress Search and Seizure

Defendant Marcks contends that Detective Retterath's search of her Harley Davidson bag on June 21, 2019, violated her rights under the Fourth Amendment. Specifically, Defendant Marcks argues that while her bag had fallen off her motorcycle, Detective Retterath had no cause to believe it was abandoned. (Doc. No. 63, Marcks Mem. in Supp. 4.) Defendant Marcks asserts that Detective Retterath's caretaking function was thus limited to locating the owner of the bag, and that his search of the bag—and specifically of the unlocked cell phone—were illegal. (*Id.* at 4–5.) Defendant Marcks argues that as a consequence, the methamphetamine found in her bag and all of the evidence later obtained from the search of Defendant Marcks's home on August 16, 2019, as well as her post-*Miranda* statements, must be suppressed as fruit of the poisonous tree. (*Id.* at 5.)

The Government disagrees, arguing that the scope of Detective Retterath's search was reasonable given his caretaking function and his duty to conduct an inventory search of the bag after taking possession of it. (Doc. No. 65, Mem. in Opp'n 9–12.) In the alternative, the Government argues that even if the search was unlawful, suppression is inappropriate because police would have inevitably discovered the drugs in the bag when it was inventoried by the Mower County Sheriff's Department. (*Id.* at 13–15.) The Government further argues that even if the methamphetamine found in the bag should be

suppressed, the evidence obtained from the search of Defendant Marcks's residence should not. (*Id.* at 16–23.)

### i.    The Roadside Search of Defendant Marcks's Bag

This Court first turns to the question of whether Detective Retterath's search of the bag was lawful. The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *United States v. Davis*, 569 F.3d 813, 816 (8th Cir. 2009) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). "The government bears the burden of establishing that an exception to the warrant requirement applies." *United States v. Williams*, 616 F.3d 760, 765 (8th Cir. 2010).

"One such exception applies when police officers engage in a community caretaking function." *United States v. Smith*, 820 F.3d 356, 360 (8th Cir. 2016) (citing *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). The Supreme Court describes the "community caretaking functions" of law enforcement as activities that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady*, 413 U.S. at 441. The Eighth Circuit has recognized that the community caretaker exception can justify non-investigatory searches and seizures in certain limited situations. *United States v. Harris*, 747 F.3d 1013, 1017 (8th Cir. 2014) (compiling cases). "A search or seizure under the community caretaking

function is reasonable if the governmental interest in law enforcement's exercise of that function, based on specific and articulable facts, outweighs the individual's interest in freedom from government intrusion." *Smith*, 820 F.3d at 360 (citing *Harris*, 747 F.3d at 1017). The reasonableness of a community caretaking search analyzed through the lens of a reasonable officer on the scene, "rather than with the 20/20 vision of hindsight." *Smith*, 820 F.3d at 360 (quoting *Samuelson v. City of New Ulm*, 455 F.3d 871, 875 (8th Cir. 2006)).

Here, Detective Retterath found a bag lying on the road near the intersection of two county highways. (Tr. 19.) The bag was large enough to contain a motorcycle helmet, and Detective Retterath believed it posed a danger to other vehicles that might hit it. (*Id.* at 19–20, 24.) Detective Retterath assumed—though he did not know for certain—that the bag had fallen off the motorcycle that he had seen moments before, and he waited for about five minutes in the hope that the owner would return. (*Id.* at 21.) Detective Retterath then decided to search the bag for items that might allow him to identify the owner, such as an ID, so that the bag could be returned. (*Id.*) As he did so, he kept an inventory, because Austin Police Department policy required him to identify any valuable or dangerous items that came into his possession. (*Id.* at 23.) Prior to searching the bag, Detective Retterath had no reason to believe the bag contained contraband. (*Id.* at 22.) This Court finds that up until this point, Detective Retterath's conduct was consistent with his caretaking function because the bag posed a hazard on the highway, and Detective Retterath was therefore justified in retrieving it and attempting to return it to its owner.

12

Detective Retterath began his search with the front pockets, where he found two cell phones, one locked and the other unlocked. (*Id.*) Detective Retterath then decided to access the call logs on the unlocked phone and tried to call one or two of the most recent numbers but could not do so due to lack of service. (*Id.*) While this Court is aware of no case law directly addressing whether cell phone data may be accessed as part of the caretaker exception to the warrant requirement, the Supreme Court has refused to extend the search-incident-to-arrest exception to include digital data on cell phones, reasoning, that the ordinary concerns justifying such exceptions (*e.g.*, officer safety and the preservation of evidence) are not implicated by cell phones. *Riley v. California*, 573 U.S. 373, 387–92 (2014). Moreover, the Supreme Court has stated that "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse" because they are "minicomputers" with "immense storage capacity." *Id.* at 393. The Supreme Court has also explicitly rejected the argument that call logs, at a minimum, should be available to law enforcement officers because even a phone's contact list can contain information beyond mere names and phone numbers. *Id.* at 400.

This Court finds this analysis instructive to the caretaker exception to the warrant requirement and Detective Retterath's search of the cell phone in this case. The caretaker exception applies only where "the governmental interest in law enforcement's exercise of that function, based on specific and articulable facts, outweighs the individual's interest in freedom from government intrusion." *Smith*, 820 F.3d at 360 (citation omitted). Here, the government interest at stake was Detective Retterath's ability to safely remove the

bag from the highway and return it to its owner. This Court finds that that interest was insufficient to override Defendant Marcks's substantial privacy interest in the contents of her cell phone.[1] Accordingly, this Court declines to extend the caretaker exception to the warrant requirement to a search of cell phone data, and finds that Detective Retterath's decision to access the unlocked cell phone crossed the line from determining who owned the bag pursuant to his caretaking functions, to conducting an illegal warrantless search that violated Defendant Marcks's rights under the Fourth Amendment.

---

[1]    The Government suggests that the bag may have been abandoned, but does not pursue that line of argument further. At least one court in this District has held that an abandoned cell phone may be searched absent a warrant. *See United States v. Crumble*, No. CR 14-362 (DWF/SER), 2015 WL 13687911, at *2–3 (D. Minn. Sept. 28, 2015), *aff'd*, 878 F.3d 656 (8th Cir. 2018). "A warrantless search of abandoned property does not implicate the Fourth Amendment, for any expectation of privacy in the item searched is forfeited upon its abandonment." *United States v. Tugwell*, 125 F.3d 600, 602 (8th Cir. 1997) (citation omitted). Once a right to privacy has been extinguished, items may be searched and seized. *Id.* To determine whether an item was abandoned, courts consider the following:

> The issue is not abandonment in the strict property right sense, but rather, whether the defendant in leaving the property has relinquished her reasonable expectation of privacy so that the search and seizure is valid. Whether an abandonment has occurred is determined on the basis of the objective facts available to the investigating officers, not on the basis of the owner's subjective intent. This determination is to be made in light of the totality of the circumstances, and two important factors are denial of ownership and physical relinquishment of the property. We consider only the information available to the officers at the time of the search.

*Tugwell*, 125 F.3d at 602 (quotations and citations omitted). Here, the evidence in the record does not support the conclusion that Detective Retterath thought Defendant Marcks's bag had been abandoned. To the contrary, Detective Retterath stated that he thought it had fallen off of the motorcycle that had passed by moments before his arrival, he waited for its owner to return, and then he attempted to identify its owner to return the bag to them. (Tr. 21–22.) Accordingly, this Court finds that Defendant Marcks's bag was not abandoned.

It does not necessarily follow from this conclusion, however, that the remainder of Detective Retterath's search of Defendant Marcks's bag was also outside the scope of the caretaker exception. In fact, this Court observes that Defendant Marcks appears to concede that the remainder of the search was constitutional, stating that, "[i]dentifying the owner of the lost backpack certainly justified an inventory search under the caretaker exception." (*See* Marcks Mem. in Supp. 4.) This Court agrees that Detective Retterath's decision to look inside Defendant Marcks's wallet was consistent with his caretaker function, as he was seeking a way to identify the owner of the bag. (Tr. 24.) His search of the coin purse, however, is a closer call.

By the time Detective Retterath searched the coin purse, he had already found Defendant Marcks's driver's license, and thus identified the owner of the bag. Thus, the next logical step in his community caretaking function would have been to attempt to locate the owner of the bag. Detective Retterath did not do so, and instead continued to search the bag's contents. This further search, including the search of the coin purse, was outside the scope of Detective Retterath's caretaking function. *See United States v. Moss*, 963 F.2d 673, 680 (4th Cir. 1992) (holding that an officer's general search of a defendant's personal effects after learning the defendant's name "belie[d]" the officer's claim that he had conducted the search to learn the defendant's identity"). This Court also observes that Detective Retterath had previously found a contact in Defendant Marcks's cell phone, Jake Wilde, who he recognized as an individual who was well-known to local law enforcement. (*Id.* at 23.) While Detective Retterath stated that he decided to look in the coin purse to determine whether it contained valuables or dangerous substances, his

connection of the bag to Jake Wilde suggests that he may have had an investigatory motive in continuing his search. (*Id.* at 23–24, 26, 42–43.) Detective Retterath did not explain what the coin purse could have contained that might be dangerous to him, nor did he explain why such a search had to be conducted roadside rather than as the bag was booked into evidence.

This Court finds that Detective Retterath's search of Defendant Marcks's cell phone exceeded the bounds of his caretaker function and violated her Fourth Amendment right to privacy. This Court further finds that Detective Retterath's search of the coin purse, which revealed the methamphetamine, was also outside the scope of his caretaker function. However, for the reasons that follow, this Court still recommends that Defendant Marcks's Motion to Suppress Search and Seizure be denied in part.

### ii.    Discovery of the Methamphetamine Was Inevitable

Even where the exclusionary rule dictates that evidence should be suppressed due to an illegal search or seizure, "[e]vidence is purged of taint and should not be suppressed '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" *United States v. McManaman*, 673 F.3d 841, 846 (8th Cir. 2012) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). The Eighth Circuit has held that the inevitable discovery exception applies where a preponderance of the evidence demonstrates: "(1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the

constitutional violation." *Id.* (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)). When conducting this analysis, courts must "focus not on what the officers actually did after unlawfully recovering evidence, but on what the officers were reasonably likely to have done had the unlawful recovery not occurred." *United States v. Villalba–Alvarado*, 345 F.3d 1007, 1020 (8th Cir. 2003).

Here, the record demonstrates that even if Detective Retterath had never conducted his roadside search of Defendant Marcks's bag, that bag would have been taken to either the Austin Police Department or the Mower County Sheriff's Department, where it would have been subject to a thorough inventory search. (Tr. 27–28, 32–34, 68–69; Gov't Exs. 9, 10.) The inventory search is another exception to the warrant requirement. "The policies behind the warrant requirement are not implicated in an inventory search . . . nor is the related concept of probable cause." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). "[I]nventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Id.* at 372. "Inventory searches must be reasonable and 'be conducted pursuant to standard police procedures.'" *United States v. Thomas*, 992 F.2d 201, 204 (8th Cir. 1993) (quoting *United States v. Davis*, 882 F.2d 1334, 1339 (8th Cir. 1989)); *see, e.g.*, *United States v. Krug*, 34 F. Supp. 2d 1064, 1071 (M.D. Tenn. 1999) (finding that a search of a briefcase booked into evidence pursuant to police department policy was a valid inventory search).

This Court finds that an inventory search of the contents of Defendant Marcks's bag would have inevitably uncovered the methamphetamine she now seeks to have

suppressed. Detective Retterath testified that ordinarily, when a City of Austin police officer retrieves lost property, it is searched, inventoried, and then placed in police custody for safekeeping, either in an off-site garage or, if the items are valuable, in evidence. (Tr. 32–33; Gov't Ex. 10.) An inventory of such items includes "all closed containers and their contents." (Gov't Ex. 10.) Detective Hemann testified that Mower County Sheriff's Department policy similarly requires that found property be inventoried and that each item be booked into evidence separately. (*See* Tr. 68–69; *see* Gov't Ex. 9 at 2.) Detective Hemann stated that this requires that officers "document every item that you are placing into evidence, including what's inside of pockets and bags and – all items." (Tr. 69.)

Accordingly, this Court finds that despite the fact that Detective Retterath's roadside search of Defendant Marcks's coin purse exceeded his caretaker function, suppression is not appropriate because the methamphetamine found therein would have inevitably been found when the bag was inventoried at the police station when turned over by Detective Retterath. Accordingly, this Court recommends that Defendant Marcks's Motion to Suppress Search and Seizure be denied.[2]

---

[2]    Defendant Marcks does not appear to seek the suppression of the information Detective Retterath viewed on her cell phone. Even if she did, however, suppression would not be warranted because the inevitable discovery of the methamphetamine in her bag would still have led Detective Hemann to obtain a search warrant for a forensic analysis of that device.

### iii.    Even if the Methamphetamine Were Suppressed, Suppression of the Evidence Discovered at Defendant Marcks's Residence and her post-*Miranda* Statements is Not Warranted

Defendant Marcks also argues that the evidence law enforcement discovered during the search of her home on August 16, 2019, as well as her post-*Miranda* statements, must be excluded as fruit of the poisonous tree. (Marcks Mem. in Supp. 5.) Again, because this Court finds that the discovery of the methamphetamine was inevitable, these arguments are moot. But even if this Court had recommended suppressing the methamphetamine found in Defendant Marcks's coin purse, it would still recommend denying her motion to suppress evidence seized during the search at her residence and her post-*Miranda* statements for the following reasons.

First, probable cause to search Defendant Marcks's residence existed independent of the evidence that derived from Detective Retterath's search of her bag. A confidential informant's tip can be sufficient to establish probable cause if the tip "is corroborated by independent evidence." *United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002) (citing *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)). Where "information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable." *Williams*, 10 F.3d at 593. The corroboration of "innocent details can suffice to establish probable cause." *United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001) (citation omitted).

Here, Detective Hemann was contacted independently by a confidential informant who provided detailed information concerning Defendant Marcks's involvement in

trafficking methamphetamine. (Tr. 60–63.) That information included correctly

identifying Defendant Marcks's address and the make and model of her car, as well as

that she was having Defendant Wilde sell the drugs to a party in Iowa who went by the

nickname "State Farm." (*Id.*) Previously, Detective Hemann had been contacted by Iowa

law enforcement, who informed him that a person named "State Farm" stated that he was

buying drugs from Defendant Wilde and a person named "Diane" in Minnesota. (*Id.* at

56–57.) All of this information is present in Detective Hemann's search warrant affidavit.

(*See* Gov't Ex. 4 at 5.) In sum, this Court finds that the information provided by the

confidential informant was sufficient to provide independent probable cause for the

search warrant even without the information derived from the search of Defendant

Marcks' bag.

Second, even if Detective Retterath's roadside search of Defendant Marcks's bag

was illegal, Defendant Marcks's post-*Miranda* statements may still be admissible if they

were voluntary. "Evidence showing statements after an illegal search were voluntary is a

means of demonstrating the evidence is attenuated from the taint." *United States v.

Riesselman*, 646 F.3d 1072, 1080 (8th Cir. 2011) (citing *United States v. Vega–Rico*, 417

F.3d 976, 979 (8th Cir. 2005)). To determine whether a statement is voluntary in this

context, the Court "must consider the giving of Miranda warnings, the 'temporal

proximity' of the illegal search and the statements made, the 'presence of intervening

circumstances,' and 'the purpose and flagrancy of the official misconduct.' *Id.* (quoting

*United States v. Lakoskey*, 462 F.3d 965, 975 (8th Cir. 2006)).

Here, all four of these factors weigh in favor of finding that Defendant Marcks's post-*Miranda* statements were voluntary. First, both statements were given after receiving valid *Miranda* warnings. (*See* Gov Ex. 5 at 4:30-5:10; Gov't Ex. 6 at 3:00-3:45.) Second, the statements were given almost two months after the search of Defendant Marcks's bag. *See United States v. Yorgensen*, 845 F.3d 908, 914 (8th Cir. 2017) (finding that the passage of two days weighed against suppression). Third, intervening circumstances can include a situation where the interviewing agent is from a separate law enforcement agency than the officer who committed the violation. *Id.* (citations omitted). Here, Detective Hemann, who was not involved in Detective Retterath's roadside search and works for a different law enforcement agency, conducted the interviews with Defendant Marcks. And finally, there is no evidence in the record that Detective Retterath's roadside search of the bag was purposeful or flagrant misconduct, and "[a]pplication of the exclusionary rule . . . does not serve [its] deterrent function when the police action, although erroneous, was not undertaken in an effort to benefit the police at the expense of the suspect's protected rights." *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006) (quotation omitted).

Therefore, for the reasons stated above, even if this Court had found that the methamphetamine found in Defendant Marcks's coin purse should be suppressed, it would still recommend that her Motion to Suppress Search and Seizure be denied in part.

### B. Defendant Wilde's Motion to Suppress Evidence Obtained as a Result of Search and Seizure

Defendant Wilde asserts that the search warrant for the phone number ending in 5139 was unsupported by probable cause in the supporting affidavit, and the fruits of that search warrant should therefore be suppressed. Specifically, Defendant Wilde argues that Detective Hemann inappropriately relied on conclusory statements and summaries of text messages about Defendant Wilde. (Doc. No. 65, Wilde Mem. in Supp. 4–5.) Defendant Wilde believes that there "are simply not enough facts in the affidavit to support the belief that evidence of a crime would be found on Ms. Wilde's phone." (*Id.* at 5.) The Government disagrees, arguing that the state court judge had a substantial basis for finding probable cause and, in the alternative, that even if probable cause did not exist, the good faith exception applies. (Mem. in Opp'n 23–27.) For the reasons that follow, this Court recommends that Defendant Wilde's Motion to Suppress Evidence Obtained as a Result of Search and Seizure be denied.

### i. The Search Warrant Was Supported by Probable Cause

The Fourth Amendment requires law enforcement to show probable cause before a search warrant is authorized. U.S. Const. amend. IV; *United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007). When determining whether probable cause exists, a detached and neutral judge must make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also Walden v. Carmack*, 156 F.3d 861, 870 (8th Cir.

1998) ("The standard of probable cause for the issuing judge is whether, given the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (quotations omitted)). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232. Courts should not review search warrants in a hyper-technical fashion. *United States v. Caswell*, 436 F.3d 894, 897 (8th Cir. 2006).

This Court "pay[s] 'great deference' to the probable cause determinations of the issuing judge" and must limit its "inquiry to discerning whether the issuing judge had a substantial basis for concluding that probable cause existed." *United States v. Butler*, 594 F.3d 955, 962 (8th Cir. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). This Court will uphold the issuing judge's determination of probable cause "as long as he had a 'substantial basis' for concluding that the 'search would uncover evidence of wrongdoing.'" *United States v. Manning*, 361 F. Supp. 3d 839, 844 (D. Minn. 2019). (quoting *United States v. Horn*, 187 F.3d 781, 785 (8th Cir. 1999)). "When the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (citation omitted). "An affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." *United States v. Mutschelknaus*, 592 F.3d 826, 828 (8th Cir. 2010) (cleaned

up). "Determining whether probable cause exists at the time of the search is a 'commonsense, practical question' to be judged from the 'totality-of-the-circumstances.'" *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007) (citation omitted).

Defendant Wilde argues that the affidavit was lacking in probable cause to search the phone number at issue because Detective Hemann used summaries of statements from different sources that are too attenuated to implicate Defendant Wilde in any criminal activity. (Wilde Mem. in Supp. 2–3.) Defendant Wilde also argues that the affidavit improperly uses the pronoun "they" to cast as wide a net as possible, and implicate Defendant Wilde in activity that law enforcement could not prove she was actually party to. (*Id.* at 5.) For the reasons that follow, this Court disagrees.

The search warrant set forth facts sufficient to conclude that there was a fair probability that evidence of criminal activity would be found in the records for the phone number ending in 5139. Detective Hemann explains in the affidavit that the two cell phones found in Defendant Marcks's bag, along with methamphetamine, were later sent for forensic analysis after receiving a search warrant. (Gov't Ex. 7 at 2.) That analysis revealed "extensive conversations about drug sales and the transportation of drugs," as well as a photograph of two "baggies" which, based on Detective Hemann's training and experience, he believed were full of methamphetamine. (*Id.*)

The affidavit summarizes the contents of these conversations, and indicates that they involved three cell phone numbers, including the phone number ending in 5139. Detective Hemann explains that the messages on the phones included conversations with a phone number from Mexico whose contact entry was labeled "Jose1," wherein

24

Defendant Marcks discussed the transportation of 30 pounds of methamphetamine from California to Austin, MN. (*Id.*) He also states that the messages revealed that Defendant Marcks purchased tickets for Defendant Wilde and D.T. to fly to California and drive a vehicle back containing methamphetamine. (*Id.*) Detective Hemann relates that the messages detailed Defendant Wilde and D.T.'s plan to meet up with Jose1's daughter, Ashley, to procure the methamphetamine. (*Id.*) The messages also track Defendant Wilde and D.T.'s progress as they drove back across the United States as they passed through Nevada, Utah, Nebraska, and finally arrived back in Austin, Minnesota. (*Id.*) Detective Hemann notes that there were no communications to Defendant Wilde found on Defendant Marcks's phones during the trip to California. (*Id.* at 3.) He notes, however, that there is reason to believe Defendant Wilde had the phone with her on that trip because at one point, when Defendant Wilde and D.T. were having trouble contacting Ashley, Defendant Marcks texted Jose1, telling him to "have her call my girl. [XXXXXX]5139 stephany." (*Id.*)

Defendant Wilde's arguments that the affidavit inappropriately uses the pronoun "they," that the affidavit does not adequately implicate Defendant Wilde, and that it failed to produce the underlying text messages in their entirety are unavailing. First, the bulk of the affidavit outlines discussions between three phone numbers, including the phone number ending in 5139, in a conspiracy to purchase methamphetamine in California and transport it cross-country to Minnesota. This Court does not find it unusual that in summarizing such discussions, Detective Hemann frequently referred to those involved—at least three individuals in Minnesota, and two in California—using the third-

person plural. Second, the search warrant was for the records of the phone number ending in 5139, and based on the facts outlined in the affidavit, it provided ample evidence that this phone number was involved in discussions of a plan to purchase methamphetamine, and would therefore likely contain further evidence of criminal activity. And finally, this Court is aware of no authority requiring affiants to present primary source material in a search warrant affidavit, and Defendant Wilde cites none. This Court observes that the one text message quoted in full does, in fact, directly implicate the phone number ending in 5139, and Detective Hemann's detailed narrative describing the discussions in which that number was involved provided a substantial basis for the issuing judge to conclude probable cause was present.

Moreover, the totality of the circumstances supports the issuance of the search warrant for records of the phone number ending in 5139. "Determining whether probable cause exists at the time of the search is a 'commonsense, practical question' to be judged from the 'totality-of-the-circumstances.'" *Donnelly*, 475 F.3d at 954 (quoting *Gates*, 462 U.S. at 230). "Probable cause . . . does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *Id.* (citation omitted.) Here, the totality of the circumstances provided sufficient chance of finding evidence of a crime. *See Manning*, 361 F. Supp. 3d at 845 ("Probable cause exists even when there is less than a 50/50 chance of finding evidence of a crime.") (citation omitted). The inclusion of the phone number ending in 5139 in discussions of a scheme to purchase methamphetamine from California and transport it back to Austin, MN, coupled with the text message to Jose1 instructing

Ashley to contact "Stephany" at that same number provided the issuing judge with good reason to believe that there was probable cause that the records for the phone number ending in 5139 would contain evidence of a crime. This Court therefore recommends that Defendant Wilde's Motion to Suppress Evidence Obtained as a Result of Search and Seizure be denied.

### ii.    Good Faith

Even if probable cause did not exist, the search warrant at issue was still facially valid, and therefore the good-faith exception to the exclusionary rule articulated in *United States v. Leon*, 468 U.S. 897 (1984), may apply. "Under the good-faith exception, evidence seized pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable." *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008). "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (alteration in original) (quotations omitted). "When assessing the objective [reasonableness] of police officers executing a warrant, [the Court] must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge." *Id.* at 431 (alteration in original) (quotations omitted).

Here, Defendant Wilde does not allege, nor is there any evidence to suggest, that the officers' reliance on the search warrant at issue was not in good faith, nor is there evidence demonstrating that the officers' reliance on the warrant was unreasonable.

Accordingly, this Court concludes that the good-faith exception would apply to the

warrant, and the evidence seized as a result of its execution should not be suppressed.

Therefore, Defendant Wilde's Motion to Suppress Evidence Obtained as a Result of

Search and Seizure should be denied.

## RECOMMENDATION

Based on the file, record, and proceedings herein, and for the reasons stated above,

**IT IS HEREBY RECOMMENDED** that:

1.    Defendant Dawn Marie Marcks's Motion to Suppress Search and Seizure

(**Doc. No. 26**) be **GRANTED IN PART AND DENIED IN PART**; and

2.    Defendant Stephany Marie Wilde's Motion to Suppress Evidence Obtained

as a Result of Search and Seizure (**Doc. No. 38**) be **DENIED**.


Date:  November 9, 2020                           *s/ Becky R. Thorson*
                                                  BECKY R. THORSON
                                                  United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written objections to this Report and Recommendation by **November 23, 2020**. A party may respond to those objections by **December 7, 2020**. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 7 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 7 days after the objections are filed; or (2) from the date a timely response is filed.